UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| KEITH CURTISS, | CASE NO. 1:21-cv-543 |
| Plaintiff, | JUDGE CHARLES E. FLEMING |
| v. | **MEMORANDUM OPINION AND ORDER** |
| CHARTER COMMMUNICATIONS, INC., *et al.*, | |
| Defendants. | |

**I.     Procedural History**

On March 9, 2021, Plaintiff, the executor of the estate of John G. Hatfield, filed a complaint against Defendants for vicarious negligence, direct negligence, wrongful death, a survival action, and punitive damages stemming from Hatfield's death. (ECF No. 1). On June 24, 2020, Hatfield collided with a cut, suspended cable line while riding a motorcycle on Depot Road. *Id*. This accident caused injuries that resulted in Hatfield's death. *Id*.

On July 29, 2022, Plaintiff moved for partial summary judgment as to the vicarious negligence claim raised against Charter Communications, LLC. (ECF No. 98, PageID 572). On July 29, 2022, Defendants moved for summary judgment as to all claims pertaining to Defendant Spectrum Mid-America, LLC, and partial summary judgment as to the second (direct negligence), fourth (survival), and fifth (punitive damages) claims against Charter Communications, LLC. (ECF No. 101, PageID 803).

On August 26, 2022, Plaintiff opposed Defendant Charter's motion for partial summary judgment, but he does not oppose Defendant Spectrum's motion for summary judgment and "does not oppose Spectrum's exiting this litigation through a ruling, or with the Court's leave to file an

1

amended Complaint." (ECF No. 117, PageID 4403). On August 29, 2022, Defendant Charter opposed Plaintiff's motion for partial summary judgment. (ECF No. 119).

On August 30, 2022, the parties attended a mediation conference and were unable to reach settlement at mediation. (ECF No. 123). On September 9, 2022, Defendants replied in support of their motion for summary judgment. (ECF No. 125). On September 12, 2022, Plaintiff replied in support of his motion for partial summary judgment. (ECF No. 126).

On September 9, 2022, Defendants objected to Plaintiff's Exhibits 1-3, 1-4, and 5 attached to Plaintiff's brief in opposition and requested that the Court strike these exhibits from the record. (ECF No. 124). On September 13, 2022, Plaintiff replied to Defendants' objections that the reconstruction graphics were demonstrative exhibits rather than substantive evidence and Mr. Miller's written statement was an authenticated document. (ECF No. 127). On September 19, 2022, Defendants replied that the reconstruction graphics appeared to be substantive evidence and the traffic crash report relied on by Miller is inadmissible hearsay. (ECF No. 129).

## II. Legal Standard

Summary judgment is proper if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine if it is "based on evidence upon which a reasonable jury could return a verdict in favor of the non-moving party." *Henderson v. Walled Lake Consol. Schools*, 469 F.3d 479, 487 (6th Cir. 2006). A fact is material if "its resolution might affect the outcome of the suit under the governing substantive law." *Id*. The moving party bears the burden of showing that no genuine issues of material fact exist. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). The court views the facts and draws all reasonable inferences in favor of the non-moving party. *Pittman v. Experian Information Solutions, Inc.*, 901 F.3d 619, 628 (6th Cir. 2018).

Once the moving party satisfies its burden, the burden shifts to the non-moving party to produce evidence that demonstrates that there is a genuine dispute of material fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986).

### III. Spectrum

Defendants argue that Defendant Spectrum is entitled to summary judgment on all claims because Mr. Miller was not in an employment or agency relationship with Spectrum, so Spectrum is not liable in this case. (ECF No. 101, PageID 820). Defendants concede that: 1) Mr. Miller was employed by Defendant Charter; 2) only Charter employees, hired, trained, and supervised Mr. Miller; and 3) Mr. Miller was working within the course and scope of his employment with Charter. *Id*. at 821.

Plaintiff does not oppose Defendant Spectrum's motion for summary judgment because there is insufficient evidence to establish a relationship between Spectrum and Plaintiff's claims. (ECF No. 117, PageID 4403). Plaintiff clarifies that he does not oppose Defendant Spectrum exiting the case through either a ruling from this Court or through the filing of an amended complaint. *Id*.

Defendants contend that Plaintiff's lack of opposition means that Defendant Spectrum is entitled to judgment as a matter of law as to claims one through five. (ECF No. 125, PageID 5228). However, it appears to be the intent of all parties that Defendant Spectrum be dismissed from the case. Accordingly, Plaintiff shall file an appropriate notice of dismissal of Defendant Spectrum within 14 days of the issuance of this decision. Understanding that all parties intend to dismiss Defendant Spectrum from this case, Defendant Spectrum's motion for summary judgment is MOOT.

### IV. Claim One

Plaintiff's first claim alleges that Matthew Miller was negligent when he cut a cable wire suspended over Depot Road on June 14, 2020 that resulted in the accident that killed Plaintiff's decedent, John G. Hatfield. (ECF No. 1, PageID 2–3). As Defendant Charter was the employer of Miller, Plaintiff alleges that Defendant Charter is vicariously liable for his actions. *Id*. at 3. Plaintiff moves for summary judgment on claim one against Defendant Charter because there is no genuine issue of material fact that Defendant Charter is the employer of Miller, Miller was negligent, and Defendant Charter is vicariously negligent as a matter of law. (ECF No. 98, PageID 572). Defendant argues that the issue of whether Miller was negligent is a genuine issue of material fact that should be left for a jury to decide. (ECF No. 119, PageID 4594). Plaintiff contends there is no dispute that Miller was negligent. (ECF No. 126).

Defendant admits that Miller was in the course and scope of his employment with Charter at the time of the accident, so Charter would be vicariously liable for any negligence attributable to Miller. (ECF No. 119, PageID 4607). A principal is only vicariously liable when an agent is directly liable. *National Union Fire Ins. Co. of Pittsburgh, PA v. Wuerth*, 913 N.E.2d 939, 944 (Ohio 2009). The only issue remaining in dispute is whether Miller was negligent.

To establish an actionable claim of negligence, Plaintiff must show the existence of a duty, a breach of that duty, and an injury proximately caused by the breach. *Rieger v. Giant Eagle, Inc.*, 138 N.E.3d 1121, 1125 (Ohio 2019). Plaintiff raises a claim of gross negligence in his motion for summary judgment. (ECF No. 98, PageID 576). Gross negligence is defined as "the failure to exercise any or very slight care" and "a failure to exercise even that care which a careless person would use." *CBC Engineers & Associates Ltd. v. Miller Aviation, LLC*, 880 F.Supp.2d 883, 887 (S.D. Ohio 2012) (*quoting Johnson v. State*, 63 N.E. 607, 609 (Ohio 1902) and *Thompson Elec. V.*

4

*Bank One, Akron, N.A.*, 525 N.E.2d 761 (Ohio 1988)). All elements of negligence must exist to establish gross negligence. *Id*. at 887–88.

    a. Duty

Plaintiff does not mention duty in his motion for summary judgment. (ECF No. 98). Defendant notes this and requests that the Court disregard any allegation of gross negligence because Plaintiff failed to address it or analyze it in his motion. (ECF No. 119, PageID 4601–02). In reply, Plaintiff alleges that Miller failed in his duty to exercise ordinary care. (ECF No. 126). However, Plaintiff cites no law or facts in support of that proposition. *Id*. With no evidence expressly cited by Plaintiff to establish the existence of a duty, Plaintiff's negligence claim fails. Nevertheless, for the sake of thoroughness, the Court will assume there is a duty and analyze the alleged breach of that duty.

    b. Breach

Plaintiff alleges that Miller "was negligent when he cut the cable and created a situational hazard to the traffic on Depot Road with no positive guidance to approaching traffic." (ECF No. 98, PageID 578). The Court interprets Plaintiff to mean that Miller breached a duty when he cut the cable from the sub-pole in the customer's front yard. Defendant contends that the drop line was not expected to impact traffic on Depot Road, so road closure, temporary traffic controls, or warning signs were unnecessary. (ECF No. 119, PageID 4605). Defendant's position is that "a genuine issue of material fact exists as to whether [Miller's] decision to start at the sub pole was reasonable and appropriate," so Plaintiff is not entitled to judgment as a matter of law. (ECF No. 119, PageID 4606–07). Plaintiff argues, "[a] person using his common experience can reach the conclusion, without expert testimony, that Mr. Miller was negligent when he dropped a wire in the roadway, because the link between this action and the fatal collision is apparent and does not

involve a scientific inquiry." (ECF No. 126). Plaintiff alleges, "Miller breached his duty of ordinary care by obstructing traffic with a dangerous hazard." *Id*.

Plaintiff seems to argue that because an accident occurred there was negligence per se. "The mere happening of an accident gives rise to no presumption of negligence." *Parras v. Standard Oil Co.*, 116 N.E.2d 300, 303 (Ohio 1953). "It is incumbent on the plaintiff to show how and why an injury occurred—to develop facts from which it can be determined by the jury that the defendant failed to exercise due care and that such failure was a proximate cause of the injury." *Boles v. Montgomery Ward & Co.*, 92 N.E.2d 9, 13 (Ohio 1950). The Court thus looks to the evidence presented to determine if Miller breached a duty of care when he cut the cable from the sub pole.

Miller replaced drop lines over a roadway hundreds of times before the incident on June 24, 2020. (ECF No. 99, PageID 755). Relying on his experience, Miller concluded that he could cut the drop line from the sub pole in the customer's front yard and it would lie flat on Depot Road. (ECF No. 99, PageID 698–99). He observed no vehicles on Depot Road since arriving at the customer's house. *Id*. at 659. Before he climbed the pole to cut the drop line, he looked both ways on Depot Road and saw no traffic. *Id*. at 695. Miller heard an approaching motorcycle seconds after he cut the line. *Id*. at 700. Contrary to his initial assessment, the cut drop line was not lying flat across the roadway and Hatfield made contact with the wire. *Id*. at 706. The drop wire was RG7. *Id*. at 677.

Plaintiff's expert, civil engineer Juan M. Morales, P.E., admitted that if the line fell as Miller anticipated, a flagger would not be required or needed. (ECF No. 112, PageID 2955). In Morales's report, he noted, "[c]able and/or wire lying flat on a roadway is usually not considered a hazard [to] the motoring public." *Id*. at 3019. Plaintiff's other expert, accident reconstructionist

6

Henry P. Lipian, stated that speed trap cables have a similar diameter to an RG7 cable and he would not consider speed trap cables as "block[ing] or obstructing the motoring or traveling public." (ECF No. 119, PageID 4684–85).

Plaintiff argues that because Miller blocked a lane of traffic, his actions fell below the standard of care of an ordinary person. (ECF No. 126). However, Miller did not intend to block the lane of traffic because he intended for the cable to lie flat across the road. As noted above, both of Plaintiff's experts conceded that result would not have created a hazard.

Consequently, the only remaining question concerning negligence is whether Miller's belief that the drop line would fall flat after he cut it from the sub pole in the customer's front yard was reasonable. The only information that Plaintiff asserts related to that analysis was, "[t]he length of the cable drop ensured that it would not lay flat on the roadway but would hang suspended before the pole." (ECF No. 98, PageID 577). Plaintiff cites no evidence in support of that proposition. Thus, Plaintiff failed to establish that there is not a genuine issue of material fact related to this issue. Plaintiff did not meet his burden to show that Miller breached a duty of care.

As no breach was established, the Court does not need to consider causation. Plaintiff failed to establish that there is no genuine dispute as to any material fact and that he is entitled to judgment as a matter of law on his vicarious negligence claim against Charter. Plaintiff's motion for summary judgment as to claim one is **DENIED**.

## V. Claim Two

Claim two alleges direct negligence by Defendant Charter for failure to train, properly instruct, and supervise their employees. (ECF No. 1, PageID 3). Defendant Charter contends that there is no evidence to support a finding that Miller was incompetent, the June 24, 2020 accident was not foreseeable, and there is no evidence that any alleged actions or omissions by Charter were

7

the proximate cause of the decedent's injuries. (ECF No. 101, PageID 823–25). Plaintiff argues that Miller's negligence is the evidence of his incompetence. (ECF No. 117, PageID 4406). Plaintiff contends that because multiple Charter witnesses endorse Miller's actions and found that he properly applied his training in temporary traffic control, Charter was put on constructive notice that its training is defective because an accident took place. (ECF No. 117, PageID 4412–13). Plaintiff states, "Hatfield was operating his motorcycle in a safe and reasonable manner and in compliance with the prima facie speed limit … Accordingly, the static hazard caused by Charter's employee was the proximate cause of the fatal collision." *Id*. at 4414.

Defendant replies that Plaintiff presents no material facts to establish that Miller was anything other than competent at the time of his hire and at the time of the accident. (ECF No. 125, PageID 5230). Defendant also asserts that Charter had neither actual nor constructive notice of any supposed incompetence of Miller. (ECF No. 125, PageID 5236).

The parties agree that the elements of a negligent supervision or training claim under Ohio law are the same as those for negligent hiring or retention. (ECF No. 101, PageID 822; ECF No. 117, PageID 4405) (both citing *Browning v. Ohio State Highway Patrol*, 786 N.E.2d 94, 104 (Ohio Ct. App. 2003)). They also agree the necessary elements to establish negligent hiring or retention are: "1) the existence of an employment relationship; 2) the employee's incompetence; 3) the employer's actual or constructive knowledge of that incompetence; 4) the employee's act or omission that caused the plaintiff's injuries; and 5) the employer's negligence in hiring, retaining, training, or supervising the employee proximately caused the plaintiff's injuries." *Herndon v. Torres*, 249 F.Supp.3d 878, 887 (N.D. Ohio 2017). "Where a plaintiff fails to show through evidence that the employee had any criminal or tortuous propensities, summary judgment in the employer's favor on negligent hiring and retention is proper." *Hout v. City of Mansfield*, 550

8

F.Supp.2d 701, 745 (N.D. Ohio 2008).

Defendant concedes that there is an employment relationship between Charter and Miller. (ECF No. 101, PageID 823). Thus, the first element is met. The Court will consider the remaining elements below.

    *a. Incompetence*

Defendant argues that there is no evidence that Miller was unqualified when he was hired or that he was an incompetent field technician at the time of the June 24, 2020 accident. (ECF No. 101, PageID 823). Plaintiff contends that "a reasonable person" could have inferred that "cutting the wire from one pole while attached to another at a distance over 100 feet" would clearly result in an overhang of that wire in the lanes of Depot Road. (ECF No. 117, PageID 4406). Defendant responds that Miller's belief that the drop line would lay flat across both lanes of Depot Road and his decision to replace the drop line starting at the sub pole is not evidence of incompetence. (ECF No. 125, PageID 5230–33). Defendant also contends that temporary traffic controls or the assistance of a second Charter employee were not required for the drop line replacement in question. (ECF No. 125, PageID 5233–36).

"[A] plaintiff must be able to establish a tort claim against the individual employee in order to maintain an action for negligent supervision or retention against the employer." *Minnich v. Cooper Farms, Inc.*, 39 F.App'x 289, 296 (6th Cir. 2002). As discussed above, Plaintiff has not yet established a negligence claim against Miller and is not entitled to summary judgment on his vicarious negligence claim against Defendant Charter. Consequently, Miller's negligence is a question for a jury to decide.

Similarly, there is a lack of evidence that Miller ever demonstrated foreseeable incompetence. Defendant hired Miller in June 2018 and he completed three weeks of training at

9

a training facility to start his job. (ECF No. 99, PageID 607–08). Miller's supervisor or other safety personnel routinely performed field safety observations where Miller's work was observed and assessed. (ECF No. 109, PageID 2281–83). The copies of those assessments do not reveal any glaring safety/training issues as Miller received a score of 100 out of 100 on every Field Safety Observation Form in 2020. (ECF No. 115, PageID 4181–86). In Miller's 2018 performance evaluation, he achieved expected performance and his supervisor noted that he struggled initially with some of the new hire testing, but he eventually passed all the tests. (ECF No. 109, PageID 2317–18). In his 2019 performance evaluation, he ranked 111 out of 271 techs on the Scorecard and again achieved expected performance. (ECF No. 109, PageID 2321). In his 2020 performance evaluation, Miller ranked 64 out of 236 techs on the Scorecard and achieved expected performance. (ECF No. 109, PageID 2325). Miller completed countless online trainings and tests over the course of his employment with Defendant and the summary of those activities noted that Miller only failed one test by two points. (ECF No. 115, PageID 4200–04). Miller received a corrective action report on April 8, 2020 because his driver's license had been suspended and he failed to report it to his supervisor. (ECF No. 109, PageID 2392). However, there is no evidence that Miller had any incidents while on the job until the incident in question.

None of this evidence reveals any criminal or tortuous propensities. Thus, even if Plaintiff were able to convince a jury that Miller was incompetent, Plaintiff runs into issues establishing the foreseeability required, as noted below.

b. *Actual or Constructive Knowledge*

Defendant noted that Plaintiff's complaint and the voluminous discovery in this case did not allege or produce any evidence that Miller had any prior misconduct that would put Defendant on notice of the potential for Miller to cause injury. (ECF No. 101, PageID 824). Plaintiff argues

that Defendant Charter had constructive notice of Miller's incompetence because they now endorse his conduct as being a reasonable and correct application of their training, ergo they were on constructive notice that their training is defective. (ECF No. 117, PageID 4412). Defendant responded that evidence of Miller's alleged incompetent act does not support a finding that Charter had actual or constructive knowledge of any alleged incompetence before the accident. (ECF No. 125, PageID 5237).

Constructive knowledge is "knowledge that one using reasonable care or diligence should have, and therefore that is attributed by law to a given person." *Herndon v. Torres*, 249 F.Supp.3d 878, 887 (N.D. Ohio 2017). "Evidence of the employee's incompetent act giving rise to the underlying negligence claim is not alone sufficient to support a finding that an employer had actual or constructive knowledge of the incompetence prior to the incident." *Farm Bureau General Insurance Co. of Michigan v. Schneider National Carriers*, 552 F.Supp.3d 750, 761 (S.D. Ohio 2021).

Plaintiff's argument that Defendant Charter had constructive notice of Miller's alleged incompetence solely relies on the fact that the June 24, 2020 incident happened. However, hindsight does not help Plaintiff establish foreseeability. Plaintiff does not cite to any evidence that would have placed Defendant on notice that Miller had any criminal or tortuous propensities. Consequently, Plaintiff has failed to establish that there is a genuine dispute of material fact as to Defendant Charter's actual or constructive notice of any alleged incompetence of Miller. The Court will not analyze the remaining factors because Plaintiff's claim of direct negligence fails. The Court **GRANTS** Defendant's motion for summary judgment as to claim two.

In Plaintiff's response to Defendant's motion for summary judgment, Plaintiff alleges that his claim of direct negligence extends beyond negligent training and supervision to include "its

11

dangerous policies, prioritizing efficiency (lower labor costs) over safety, creating the foreseeable conditions that lead to this fatal incident." (ECF No. 117, PageID 4414). Defendant challenges that this is an attempt by Plaintiff to introduce new allegations and a new argument, which is prohibited by Rule 15(a)(2) and the Sixth Circuit. (ECF No. 125, PageID 5238–39). To determine if this is an attempt to amend the pleadings, the Court reviewed the language of the complaint. Two allegations in the second claim do not reference negligent training and supervision. (ECF No. 1, PageID 4). The first states that Defendant "failed to assign or provide additional employees to safely perform the work to repair the cable TV wire, including assigning temporary traffic control." *Id*. The second alleges Defendant "had a duty to the public to follow safety laws and regulations governing telecommunication utilities, its own safety regulations, safety regulations imposed within poll leasing agreements, and industry standard safety regulations." *Id*. These allegations do not identify or challenge any dangerous policies. They also fail to allege that Defendant prioritized efficiency over safety. Unless Plaintiff would like to amend his complaint, the Court will not address these new arguments because they were raised improperly.

## VI. Claim Four

Plaintiff's fourth claim is a survival action for the "terror and conscious anguish, suffering, and pain" the decedent experienced prior to his death. (ECF No. 1, PageID 5). Defendant argues that it is entitled to summary judgment with respect to claim four because Plaintiff cannot establish that the decedent experienced conscious pain and suffering. (ECF No. 101, PageID 826). Plaintiff does not contend that decedent was ever fully conscious following the accident, but he argues that decedent was not fully unconscious because his pain level was being monitored and treated by the responding medical professionals. (ECF No. 117, PageID 4416–17). Defendant responds that Hatfield was unconscious and unresponsive from the moment that Miller arrived to aid him until

he died, as testified to by the medical providers who treated him after the accident. (ECF No. 125, PageID 5240).

To recover for pain and suffering in a survival action, Plaintiff must show "that the decedent was not completely unconscious during the interval between the accident and death, and that he was therefore capable of experiencing pain and suffering." *Flory v. New York Cent. R. Co.*, 163 N.E.2d 902, 905 (Ohio 1959). "[S]ince one cannot experience pain and suffering while unconscious no recovery can be had for pain and suffering endured by one fatally injured by the negligence of another if the injured person is rendered unconscious at the instant of the injury and dies of such injuries without ever having regained consciousness." *Id*.

Miller was the first person to attend to Hatfield after the accident. (ECF No. 99, PageID 750). Miller recalls that Hatfield was making a snoring sound while he was breathing. (ECF No. 99, PageID 749). This sound is clear on the audio recording of the 911 call. (ECF No. 114). During the 911 call, Miller informs the 911 operator that Hatfield's eyes are open, but that Hatfield is unresponsive. *Id*. Miller testified that Hatfield's eyes never blinked during the three minutes he was with him, Hatfield never made any noise other than the snoring sound, and none of his extremities ever moved. (ECF No. 99, PageID 750–51).

Duraid Younan, M.D., was the doctor that attended to Hatfield when he arrived at the hospital. (ECF No. 105, PageID 1493). Dr. Younan does not recall treating the decedent, so he relied on the medical records to refresh his recollection. *Id*. Dr. Younan described that a common way to measure a patient's consciousness is to use the Glasgow Coma Scale, which provides a score from 3 to 15 with 3 meaning "that patient is really not doing anything neurologically." (ECF No. 105, PageID 1515). There are three components to the scoring: 1) eye opening, 2) verbal responses, and 3) motor responses. (ECF No. 105, PageID 1516). In referencing the medical

13

documents, Dr. Younan confirmed that Hatfield was ranked as a three on the Glasgow Coma Scale during his time at the hospital. (ECF No. 105, PageID 1549–50).

Captain James E. Krenisky was a paramedic for the Saybrook Township Fire Department at the time of the June 24, 2020 incident. (ECF No. 107, PageID 1870). Captain Krenisky's ambulance was the first to the scene. (ECF No. 107, PageID 1893). Hatfield's eyes were open, "but he wasn't able to respond in any way." (ECF No. 107, PageID 1896). Captain Krenisky immediately called for a helicopter to get Hatfield to a trauma center because of "[t]he gaze. I knew he had a head injury like immediately." (ECF No. 107, PageID 1899). Captain Krenisky scored Hatfield as a three on the Glasgow Coma Scale because "there was no eye movement, there was no motor skills, there were no verbal." (ECF No. 107, PageID 1911). He explained that Hatfield's eyes were open "because he didn't have the wherewithal to shut them." (ECF No. 107, PageID 1913). Captain Krenisky confirmed that Hatfield was unconscious and unresponsive the entire time he was in his care and that his pupils were fixed and dilated, which tends to indicate a head injury. (ECF No. 107, PageID 1915–22). Captain Krenisky confirmed that Hatfield had snoring respirations, which he clarified is not normal breathing and often indicates a head injury. (ECF No. 107, PageID 1950).

Michael Boland was a nurse involved in Hatfield's air transport to the hospital. (ECF No. 110, PageID 2511). Boland ranked Hatfield as a three on the Glasgow Coma Scale during his time with him because there was "[n]o eye opening, no verbal response, and no motor response to stimulus." (ECF No. 110, PageID 2528). Boland administered fentanyl to Hatfield because of his elevated heart rate and noted that increased heart rate is one sign that someone is in pain. (ECF No. 110, PageID 2530). However, Boland clarified that Hatfield never responded to anything while in his care and never demonstrated that he was experiencing pain. (ECF No. 110, PageID

14

2547–48).

Plaintiff cites to Hatfield's increased heart rate as evidence that he was experiencing pain and cites to *Bradley ex rel. Estate of Bradley v. University Hospitals of Cleveland, Inc.*, 2001 WL 1654762 (Ohio App. 2001) to support his argument that this creates a question of fact for a jury to resolve. However, the evidence in *Bradley* is distinguishable from our case and Plaintiff cites to no law to support the premise that elevated heart rate is evidence of conscious pain and suffering. The decedent in *Bradley* "was thrashing and had become extremely agitated" and when awakening from sedation, "his pupils were brisk and reactive." *Id*. at *5. Every individual and medical professional that interacted with Hatfield prior to his death qualified him as unresponsive and ranked him as the lowest score possible on the Glasgow Coma Scale, which indicates that he was unconscious. Since there is no evidence that the decedent was not completely unconscious during the interval between the accident and death, Defendant is entitled to summary judgment in its favor with respect to Plaintiff's survival claim. The Court **GRANTS** Defendant's motion for summary judgment as to claim four. (ECF No. 101).

## VII. Claim Five

Plaintiff's fifth claim seeks punitive damages against Defendant. (ECF No. 1, PageID 6). Defendant argues that it is entitled to summary judgment because punitive damages are unavailable to plaintiffs in a wrongful death action and there is no evidence of conscious pain and suffering. (ECF No. 101, PageID 827–32). Plaintiff admits that Defendant is correct that "Ohio case law reflects that in liability for torts involving fatal injuries, punitive damages are limited to those claims alleging survivorship and not statutory wrongful death claims." (ECF No. 117, PageID 4418). However, Plaintiff believes "it is contrary to public policy that punitive damages, which exist to punish wrongful conduct, would not be available in instances where the violence of the

15

tortuous act is so severe as to cause instant death." (ECF No. 117, PageID 4418–19). Defendant notes that Plaintiff does not dispute that Ohio law prohibits punitive damages in wrongful death actions. (ECF No. 125, PageID 5241). Thus, the only way Plaintiff could recover punitive damages would be as part of his survival claim, which Defendant argues fails due to no evidence of conscious pain and suffering. *Id*.

As the Court previously indicated, Defendant is entitled to summary judgment as to Plaintiff's survival claim. As a result, Plaintiff's punitive damages claim is no longer viable. The Court **GRANTS** Defendant's motion for summary judgment against Plaintiff with respect to claim five.

### VIII. Conclusion

Plaintiff's motion for partial summary judgment as to claim one is **DENIED**. (ECF No. 98). Defendant Charter's motion for partial summary judgment is **GRANTED** as to claims two, four, and five. (ECF No. 101). With the understanding that all parties intend to dismiss Defendant Spectrum from this case, Defendant Spectrum's motion for summary judgment is **DENIED AS MOOT**. (ECF No. 101). Plaintiff shall file an appropriate notice of dismissal within **14 days** of the issuance of this decision.

As to Defendant's objections to Plaintiff's Exhibits 1-3, 1-4, and 5 (ECF No. 124), the Court did not rely on that evidence in ruling on the motions for summary judgment, so Defendant's objections are **DENIED AS MOOT**. Defendant is free to raise any evidentiary concerns regarding those exhibits if Plaintiff introduces them again in the future.

**IT IS SO ORDERED**.

Dated: September 26, 2023

_____
**HONORABLE CHARLES E. FLEMING**
**UNITED STATES DISTRICT JUDGE**